IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSALIE A. MOOS-HOLLING,<br><br>    Plaintiff,<br><br>  v.<br><br>BAYER CORPORATION DISABILITY PLAN,<br><br>    Defendant.<br>                                      / | No. C 07-06240 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

On December 19, 2008, the Court heard oral argument on the parties' cross-motions for summary judgment. Having considered the arguments of the parties and the papers submitted, and for good cause shown, defendant's motion is GRANTED and plaintiff's motion is DENIED.

**BACKGROUND**

**1.    Plaintiff's Claim**

This case arises out of the termination of plaintiff's long term disability benefits by defendant Bayer Corporation Disability Plans ("the Plans")[1] on November 30, 2005, when Broadspire,[2] the third-party administrator of the Plans, determined that plaintiff no longer met the Plans' definition of "disabled."

Plaintiff Rosalie A. Moos-Holling is a 59-year-old woman who worked for Bayer Corporation from January, 2000 until July, 2002 as a microbiologist. Her job title in July, 2002 was "QA Production

---

[1] Defendant was erroneously sued as "Bayer Corporation Disability Plan."

[2] Broadspire was formerly known as Kemper National Services, Inc. ("Kemper").

Document Release Administrator." On September 1, 2002, plaintiff lost consciousness at her home and awoke to find herself on the floor with bruises on the left side of her body and her right arm paralyzed, numb, and cold. BA 0358; 72d.[3] She drove herself to the nearby Alameda Hospital for emergency care. BA 72e. Dr. John Friedberg, her treating neurologist, determined on September 13, 2002, that her "primary problem with the [right] arm is proximal; she cannot elevate it overhead without holding her hair with her fingers. The grip and finger strength is relatively preserved, but the shoulder girdle muscles are almost totally out, as is [sic] the biceps and triceps." BA 0359. Plaintiff did not return to work after the September 1 episode.[4]

By virtue of her employment, plaintiff was eligible for long term disability coverage under the Plans. Under the terms of the Plans, "totally disabled" is defined as follows: For the first six months after Short Term Disability (STD) benefits end, the claimant is "unable to perform the essential duties of [his/her] occupation." Beginning six months after the commencement of long term disability benefits, the claimant "must be unable to work at any job for which [he/she] [is] or could become qualified by education, training or experience." BA 0042.

Dr. Friedberg noted on March 10, 2003 that plaintiff's right arm "remains significantly weak" and exhibited "altered and unpleasant sensations provoked by light touch." BA 0369. He estimated that she would be able to return to work on June 1, but without any writing, typing, or manual work with her right arm. *Id.* Plaintiff applied for disability benefits and Kemper initially denied her request. On March 17, 2003, plaintiff contested that decision, noting that her thumb and index finger on her right arm were still swollen, which made writing difficult, and that even though her job was classified as "light duty work," it did require that she be able to write. BA 0217. Plaintiff also noted that her symptoms might not have been understood by Dr. Lawrence Blumberg, Kemper's reviewing doctor, because he was an orthopedic surgeon, not a neurologist. *Id.*; *see also* BA 0222.

---

[3] "BA" refers to the administrative record in this case.

[4] Prior to September 1, 2002, plaintiff had not been at work since July 12, 2002. When she sought disability benefits from the Social Security Administration, as discussed below, she argued that her absence from work beginning on July 12 was due to disabling depression and anxiety. BA 0031 The Administrative Law Judge who considered her claim found that this contention was not credible. BA 0035. Plaintiff does not contend to this Court that she was disabled prior to September 1.

2

Kemper requested that Dr. Vaughn Cohan, a neurologist, conduct a peer review of plaintiff's claim. Dr. Cohan concluded on April 21, 2003 that "the documentation does demonstrate objective evidence of a functional impairment which would preclude the claimant from performing the essential elements of her own occupation at this time." BA 49. He also stated that plaintiff's claim should be reviewed if plaintiff had not returned to work by June 1, 2003. *Id.* On April 24, 2003, Kemper reversed its prior decision, determined that plaintiff was eligible for benefits, and informed her that "in order to remain eligible for continued [long-term disability] Plan benefits, it is necessary for you to remain under the regular care of a legally qualified physician. Periodically, the Claims Examiner will request updates on your disabling condition and medical authorizations as needed." BA 0238.

On June 2, 2003, Dr. Friedberg noted the plaintiff "cannot use dominant right hand" and that "light touch remains so painful as to be intolerable." BA 0248. He observed that plaintiff "continues to improve but asymptotically slowly" and predicted that she would be able to return to work on the one-year anniversary of her accident. BA 0248-249. On August 22, 2003, Dr. Friedberg concluded, "Seems to have recovered her strength and there is no visible appearance of RSD – I think she should be sent for independent job evaluations." BA 0247.[5] In a separate report that is also dated August 22, 2003, Dr. Friedberg stated that "strength, reflexes have returned as hoped after one year . . . persisting problem is pain." BA 0244. In addition, he noted, "There are no new objective findings . . . patient continues to hold right forefinger extended and has faint suggestion of bicep weakness." *Id.* He described plaintiff's symptoms as "complains of stiffness right first finger and pain on using it." *Id.* The administrative record also includes the following note by Dr. Friedberg, also dated August 22, 2003: "It would be a mistake in my view to ignore her symptom, permit her to [return to work] prematurely (a year is not excessive for recovery from near total paralysis) and risk the painfully disabling and indubitably permanent effects of reflex sympathe[tic] dystrophy . . . this patient isn't exaggerating." BA 0243.

Dr. Cohan performed another peer review on October 23, 2003 and concluded that the available documentation "fails to support functional impairments that preclude work." BA 0051. Dr. Cohan

---

[5] RSD apparently refers to "reflex sympathetic dystrophy." BA0051.

3

opined that some of Dr. Friedberg's statements were conflicting and that the hypothesis that a return to work would be injurious was "not supported by objective data." *Id.*

Broadspire arranged a "functional capacity evaluation" of plaintiff on December 22, 2003. BA 0054-06. The evaluation took three hours and was performed by Arleen D. Thomas, a physical therapist. Thomas made the following conclusions:

> Evaluee is able to do all activities with the exception of any activity that requires fine motor dexterity, pinch and/or grasp involving the thumb and index finger of the right hand. . . . Her testing performance is consistent with clinical observations and she does not express signs of symptom magnification behavior or submaximal effort. [Plaintiff] should be able to tolerate most activities as long as it [sic] doesn't require fine motor control of the fingers due to reported "hypersensitivity." If she is to continue work at the computer, recommendations involve a voice activated system and ergonomics evaluation of her workplace. . . . [Plaintiff] seems able to perform the functions listed on her Job Description.

BA 0054-07.

In May 24, 2004, Broadspire completed an "employee assessment report," a study designed to assess "the vocational factors which may impact [plaintiff's] ability to become employed." BA 54-29. The assessment noted that plaintiff "is able to do all activities with the exception of any activity that requires fine motor dexterity, pinch and grasp involving the thumb and index finger of the right hand." BA 54-30. It characterized plaintiff as "not employable" but also concluded, "Results indicate there are appropriate occupations based on [plaintiff's] work skills and physical capacity for work." BA 54-36.

Broadspire contacted Bayer in October, 2004 regarding the employee assessment report and noted "Our review has found that medically she is capable of working with restrictions/limitations . . . . Does Bayer have any positions that will accommodate her abilities as noted? Based on her salary it will be difficult to find her a position within her Labor Market." BA 0288. Bayer responded in February, 2005 that the employee assessment report was insufficient and that Bayer "would need to know the specific limitations/restrictions and duration of same based on evaluation by her physician in order for the Company to proceed with determining its ability to provide accommodation. We would like to have this information as soon as possible in order to proceed with the determination. Please advise when Broadspire will be able to provide the information from her physician." BA 0306.

On May 19, 2005, Administrative Law Judge Alan K. Goldhammer held a hearing on Social Security Administration's denial of plaintiff's claims for Social Security Disability benefits. Judge

4

Goldhammer made the following findings of fact:

> The medical evidence establishes as of September 1, 2002 that the claimant had developed "severe" right reflex sympathetic dystrophy, brachial plexus neuritis (Parsonage-Turner Syndrome[6]), and cervical radiculopathy.
>
> . . .
>
> The claimant's testimony was generally credible but not to the extent she alleged disability prior to September 1, 2002.
>
> From September 1, 2002 on, the claimant had a residual functional capacity sufficient for light work with no lifting or carrying more than 5 pounds with the right dominant hand and with no involvement of the forefinger and thumb. Prior to December 2003 the claimant had no use of her dominant right hand at all. After then, the claimant was still unable to pinch with her forefinger and thumb and could not grip or grasp for more than 10 to 15 minutes. Prior to December 2003, the claimant could not perform any writing or data entry; after December 2003, she could write or keyboard for perhaps as much as 10 to 15 minutes but would then have to rest her hand for an equal amount of time afterwards.
>
> Since September 1, 2002, according to vocational expert testimony as discussed earlier, the claimant has been unable to perform her past relevant work.

BA 035. Judge Goldhammer determined that plaintiff had been under a "disability," as defined in the Social Security Act, since September 1, 2002. BA 036. He therefore concluded that she was eligible for disability benefits for the period from September 1, 2002 to August, 2005. *Id.*

From November, 2004 until June, 2005, Broadspire experienced difficulty obtaining records from plaintiff regarding her treating physicians' evaluations. BA 290-303; 324-325; 466-470. On June 30, 2005, Broadspire determined that, in light of the absence of records received from treating physicians, it would order an independent medical exam of plaintiff. BA 470.

At Broadspire's request, Dr. Richard Rubenstein, a neurologist, examined plaintiff on August 22, 2005. Dr. Rubenstein performed a physical examination, interviewed plaintiff, and created a summary of twenty medical records dating from September 13, 2002 to March 15, 2005. Dr. Rubenstein wrote a thirty-two page report, in which he concluded that plaintiff had been capable of a full-time return to work without restriction as of June 1, 2003. BA 0054-69. In his opinion, "[r]eturn to work would be therapeutic for [plaintiff] and should be entertained as quickly as possible." *Id.*

---

[6] The Court notes that Parsonage-Turner Syndrome is defined as "a neuralgic disorder, of unknown cause, characterized by sudden onset of severe pain, usually about the shoulder and often beginning at night, soon followed by weakness and wasting of various forequarter muscles." *Stedman's Medical Dictionary* 70 (28th ed. 2007).

5

Dr. Gerald Goldberg, also a neurologist, conducted a peer review of plaintiff's records for Broadspire on October 12, 2005. Dr. Goldberg concurred in Dr. Rubenstein's conclusion that plaintiff was not totally disabled. BA 0054.

Broadspire informed plaintiff on October 12, 2005 that it had determined she was not disabled from any occupation. If she did not agree with this determination, she was directed to submit medical documentation of her disability within 30 days. BA 339-340. Broadspire notified her on November 14, 2005 that her long term disability benefits would be terminated as of November 30, 2005. BA 0039. In the same letter, Broadspire stated that plaintiff had so far submitted only Judge Goldhammer's opinion from the Social Security benefits proceeding, and that this document did not constitute "documented objective medical findings." *Id.*

The Plans' ERISA Review Committee considered plaintiff's appeal on March 8, 2006 and upheld the initial determination that plaintiff was no longer disabled.

### 2.    **Structure of the Plans**

Bayer is the "administrator" of the Plans within the meaning of section 3(16)(A) of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Def. First Supp. Discl. in Supp. of Mot. for Summ. J. ("Terms of Plans"), at 484, § 8.2. Bayer has discretion to make findings of fact necessary to determine eligibility for benefits and to interpret the terms of the Plans. Terms of Plans, at p. 485, § 8.4. Bayer may also employ third parties to act on its behalf to administer the plan. *Id.* § 8.3.

Benefits paid out by the Plans come from the Plans' trust. *See* Decl. of James Martin in Supp. of Mot. for Summ. J. ("Martin Decl."), ¶ 2. The short term disability plan is funded solely by contributions from Bayer's general assets. *See* Terms of Plans, at p. 484, § 8.1. The long term disability plan is funded by contributions from Bayer and salary-reduction contributions from plan participants. *Id.* Mellon Bank is the trustee. *See* Martin Decl. ¶ 3. The trust is funded on an annualized basis based on a calculation that includes a determination of how long it would take for the trust to completely exhaust based on its current obligations. *See id.*, ¶ 4. The parties dispute the mechanism through which the trust is funded. According to Bayer, the trust is a Voluntary Employees' Beneficiary Association

("VEBA") Trust and is funded through periodic, non-reversionary contributions. Plaintiff does not agree with this characterization.

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir.1991). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

**DISCUSSION**

**1.     Standard of Review**

The parties dispute what standard of review the Court should apply to the decision to terminate plaintiff's disability benefits. "The Supreme Court has held that a denial of benefits 'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023 (9th Cir. 2008) (quoting *Firestone Tire &*

*Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." *Id.* at 1023-24 (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006) (en banc)). In this case, the Plans grant Bayer the right to interpret the terms of the Plans and determine the eligibility for benefits. Accordingly, the Court must apply an abuse of discretion standard.

The Court must also determine whether the plan administrator operated under a conflict of interest in its determination of plaintiff's eligibility for benefits, and if so, how much weight that conflict should be given when the Court evaluates whether a plan administrator has abused its discretion. *See Metropolitan Life Ins. Co. v. Glenn*, __ U.S. __, 128 S. Ct. 2343, 2348 (2008) (" If 'a benefit plan gives discretion to an administrator or fiduciary who is operating *under a conflict of interest*, that conflict must be *weighed* as a *factor* in determining whether there is an abuse of discretion.'") (quoting *Firestone*, 489 U.S. at 115) (emphasis added in *Glenn*).

**A.   The conflict of interest is a minimal factor because the Plans were funded by a trust**

The Ninth Circuit's analysis of the structural conflict in *Burke* is instructive in this case. In *Burke*, benefits paid out by the long term disability plan came from the plan's trust. 544 F.3d at 1017. *Burke* held that "most significantly," the conflict of interest is mitigated when benefits are paid out of the plan's trust (rather than directly by the employer), because there is "no *direct* financial impact on [the company] resulting from the distribution of benefits." *Id.* at 1025 (emphasis in original). The court found that the fact that the company's employees made some contribution to the trust also lessened the structural conflict of interest. *Id.* at 1026. Finally, the plan in *Burke* was both administered and funded by the employer. *Id.* at 1027. This factor tended to increase the plan's structural conflict. *Id.* Weighing all three factors, the court concluded that a structural conflict of interest existed, but that it was less of a conflict than is present in the "typical dual-role plan," when one entity both determines whether an employee is eligible for benefits and pays for the benefits. *Id.*

The parties dispute whether payment of the Plans from the trust at issue here decreases the structural conflict of interest, as was the case in *Burke*. Bayer contends that the trust is a Voluntary Employees' Beneficiary Association ("VEBA") trust, funded through "periodic, non-reversionary"

8

contributions from Bayer. *See* Martin Decl. ¶ 2,3. In support of this characterization, Bayer provides a declaration from James K. Martin, Director of Capital Markets and Trust Investments for Bayer's North America operations. *See id.* ¶ 1. If true, this structure would make the Bayer trust similar to the trust in *Burke*, which was also a VEBA trust, i.e. funded through non-reversionary contributions. *See* 544 F.3d at 1018.

Plaintiff contends that there is no evidence that the trust actually funds Bayer's disability plans. Plaintiff cites the 1990 agreement that established the trust. In fact, this document states that the Plans would pay benefits for medical and dental plans "and such other plans as may be participating in this Agreement from time to time which shall also be known as the Plan." *See* Terms of Plans, at p. 489. Plaintiff also argues that there is no evidence that Bayer must fund the trust on an actuarially sound basis. Plaintiff cites no evidence, however, establishing that Bayer did not comply with its statutory obligations as a fiduciary. *See* 29 U.S.C. §§ 1102, 1103.

Finally, plaintiff appears to request that this Court adopt the findings of a district court in the Eleventh Circuit, which determined that a 2003 actuarial report "unequivocally" indicated that Bayer's trust was "significantly underfunded," with Plan liabilities projected to exceed its assets by $47 million by the end of 2003. *See Scarpulla v. Bayer Corp. Disability Plan*, 514 F. Supp. 2d 1262, 1274 (N.D. Ala. 2007). This Court cannot do so. The existence of a structural conflict must be decided on the record before the Court in *this* case, and the record here (including evidence outside the administrative record) is devoid of any evidence that the trust was underfunded. Moreover, the actuarial report in *Scarpulla* pertained to the financial health of the trust in 2003, the year that Scarpulla's claim was finally denied. Here, plaintiff's benefits were terminated on November 15, 2005. Plaintiff cites no evidence of the trust's finances at that time.[7] The Court finds that plaintiff has failed to establish the

---

[7] Plaintiff also argues that the lack of evidence to challenge Bayer's characterization of the trust is due to Bayer's failure to comply with plaintiff's discovery requests. Plaintiff, however, was dilatory in seeking the Court's intervention in discovery disputes. As discussed in the Court's prior Order, the Court directed the parties on August 22 to brief discovery issues prior to filing dispositive motions, which were due October 31. *See* Order Denying Pl. Mot. to Compel Disc. and for a Continuance. [Docket No. 45] On October 28, plaintiff filed her only discovery motion. The Court rejected the request because, in addition to being untimely, it was not sufficiently specific. Plaintiff requested that the Court compel "all of the outstanding discovery which has not been answered." Pl. Letter Br., at 4. [Docket No. 22] Plaintiff did not specify which discovery requests had not been answered satisfactorily. Instead, she attached to her letter brief approximately fifty pages of documents consisting of her

9

existence of a triable issue of fact as to whether the trust is funded through periodic, non-reversionary payments.

The trust here is also analogous to the trust in *Burke* in two other respects analyzed by Ninth Circuit: Bayer employees make some contribution to the trust[8] and Bayer both administers and pays for the Plans. Under *Burke*, the first factor lessens the structural conflict, while the second tends to increase it. On balance, the Court concludes that while some conflict of interest is created by the fact that "the less the Trust pays out as benefits, the less [Bayer] will ultimately need to contribute to the Trust to maintain its solvency," *see id.* at 1026, the structural conflict here is minimal.

### B. Other circumstances surrounding Bayer's denial of benefits establish that the Court should give weight to the structural conflict of interest

In *Glenn*, the Supreme Court held the existence of a structural conflict of interest is more important where "circumstances suggest a higher likelihood that it affected the benefits decision". 128 S. Ct. at 2351. Relevant factors to this determination are whether the insurance company administrator "has a history of biased claims administration;" whether the administrator "has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* In *Glenn*, it was relevant that the administrator

> had encouraged [the plaintiff] to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored the agency's finding in concluding that [the plaintiff] could in fact do sedentary work.

---

discovery requests and Bayer's responses. Plaintiff cannot make an eleventh-hour request for "all outstanding discovery" and then attempt to create a factual dispute on summary judgment by citing to the absence of evidence in the record.

[8] Plaintiff argues that nothing in the record indicates to what degree the trust is funded by employee contributions, as opposed to corporate contributions from Bayer. It was also the case in *Burke*, however, that it was "unclear from the record what portion of the [trust] was funded by the employees, as opposed to by [the company]." 544 F.3d at 1018. Despite the absence of evidence on this point, *Burke* concluded that the fact that employees made *some* contribution tended to lessen the structural conflict of interest. *Id.* at 1026.

10

*Id.* It was also relevant that the administrator had emphasized a report that favored a denial of benefits while deemphasizing other reports suggesting a contrary conclusion, and failed to provide its independent experts with all of the relevant evidence. *Id.*

In this case, some of the circumstances of Bayer's denial of benefits suggest that the structural conflict of interest should be afforded greater weight. First, *Scarpulla* demonstrates that there is at least one instance in which a court found Bayer's claims administration process to be biased. Second, there is nothing in the record establishing that Bayer has taken measures to penalize inaccurate decision making by claim administrators. Third, Broadspire encouraged plaintiff to apply for Social Security disability benefits and referred her to a claims administration company, Allsup, Inc., to represent her during that proceeding, *see* BA 0168, but then failed to credit the opinion of the ALJ that plaintiff was disabled as of August, 2005. Finally, Broadspire emphasized the reports of the medical professionals it hired – Dr. Rubenstein, Dr. Goldberg, and Dr. Cohan – but deemphasized the opinions of plaintiff's treating neurologist, Dr. Friedberg.

Plaintiff argues that other circumstances in this case indicate bias on the part of Bayer. The Court disagrees. Plaintiff makes much of the fact that the original administrative record filed by Bayer did not identify the members of the ERISA Review Committee that rejected plaintiff's appeal or minutes of the meeting at which her appeal was denied. Bayer, however, provided this information to plaintiff in response to a discovery request. *See* Decl. of Jerome Schreibstein in Opp. to Pl. Mot. for Summ. J. ("Schreibstein Decl."), at exs. B, C.

Plaintiff also attempts to establish that Susan Murphy, a member of the ERISA Review Committee, had knowledge of the trust's finances and made decisions on the payment of benefits, and was therefore irreconcilably conflicted. Plaintiff submits – in her reply brief – a document that purports to be the deposition of Murphy taken on March 16, 2006 in conjunction with *Scarpulla*. [Docket No. 50] The Court denies plaintiff's request to take judicial notice of this 185-page document because plaintiff has provided no basis for establishing that it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201; *Turnacliff v. Westly*, 546 F.3d 1113, 1120 n.5 (9th Cir. 2008).

11

Moreover, Murphy's deposition testimony in *Scarpulla* does not contradict her claim that her job responsibilities did not include overseeing the funding of the trust. *See* Decl. of Susan Murphy ¶ 3. [Docket No. 39] The portions of the *Scarpulla* testimony cited by plaintiff establish that she was involved in the decision to terminate Broadspire as the third-party administrator because its fees were too high and that a quality sought in review committee members was that they would "best represent the business." Neither of these statements contradicts Murphy's claim that she was not responsible for decisions on how to fund the trust.

In addition, the members of the reviewing committee that denied plaintiff's final appeal on March 8, 2006 have submitted declarations stating that at that time, they had no job responsibilities overseeing funding of the trust and that their job duties did not include preparing reports its financial condition. *See* Schreibstein Decl., at ex. B, p. 701 (minutes of March 8 meeting); *see also* Decls. of Lori Lechner, James Hughes, Susan Murphy, and Helen Swiatek. [Docket Nos. 37-40] Plaintiff cites no admissible evidence that calls their statements into doubt.

Finally, plaintiff appears to argue that the numbering of pages in the administrative record is an irregularity indicating that the conflict of interest affected Bayer's decision on plaintiff's benefits. Plaintiff notes that some documents in the administrative record have been stamped with two sets of numbers. Plaintiff speculates that this double numbering might indicate that these documents were "collected in [a] special manner, perhaps for submission to [t]he ERISA Review Committee." Pl. Opp. to Def. Mot. for Summ. J., at 8. She also suggests that "special" numbering might also mean that certain documents were "overlooked and not included in the records" submitted to the review committee. Pl. Reply in Supp. of Mot. for Summ. J., at 3. Plaintiff cites no evidence, however, in support of these theories about the numbering of pages in the administrative record. In the absence of any evidence, the Court has no basis to infer that certain documents were or were not included in the administrative record when plaintiff's claim was denied.

In sum, *Burke* establishes that Bayer operated under a minimal conflict of interest. Under *Glenn*, the circumstances of this case suggest that this conflict of interest may have had some influence on

Bayer's decision to terminate plaintiff's benefits. Accordingly, the Court will apply a heavy dose of skepticism in its abuse of discretion review.[9]

**2. Review of the Decision to Terminate Plaintiff's Long Term Disability Benefits**

Taking into account the structural conflict of interest between Bayer Corporation and the Plans, as well as all of the circumstances of plaintiff's claim, the Court concludes that it was not an abuse of discretion for Bayer to terminate plaintiff's long term disability benefits in November, 2005.

Dr. Friedberg, plaintiff's treating neurologist, repeatedly opined that plaintiff's condition would not be permanently disabling and that she should eventually be able to return to work. It was therefore consistent with the medical opinion of plaintiff's treating physician for Bayer to require plaintiff to provide regular medical documentation of her disability. The record establishes that plaintiff ceased providing Broadspire with the required medical documentation in November, 2004. Broadspire gave plaintiff notice that she had failed to comply with his reporting requirements. When plaintiff failed to respond, Broadspire ordered an independent medical examination by a neurologist, Dr. Rubenstein, in August, 2005.[10] Dr. Rubenstein's conclusion that plaintiff was not disabled was reviewed and confirmed by Dr. Goldberg, who is also a neurologist, in October, 2005.

Plaintiff was given the opportunity to dispute these findings, but she submitted only Judge Goldhammer's determination that plaintiff was eligible for Social Security disability benefits. Significantly, Judge Goldhammer's opinion was based on an application that was submitted in August, 2003; the last medical evaluation that he cites was performed by a Dr. Newton, in March, 2004. While

---

[9] Plaintiff contends that *Nolan v. Heald College*, No. 07-15679, 2009 WL 69238 (9th Cir. Jan. 13, 2009), decided after oral argument in this case, "significantly impacts" these motions. [Docket No. 58] The Court disagrees. *Nolan* held that evidence of bias should be viewed "through the lens of the traditional rules of summary judgment," i.e. in the light most favorable to the non-moving party. 2009 WL 69238 at *6. For the most part, plaintiff relies not on evidence of bias but on an absence of evidence, which is due to plaintiff's own failure to seek the Court's intervention in discovery disputes. Where plaintiff has properly cited evidence of bias, the Court has concluded that this bias requires the Court to temper the abuse of discretion standard with skepticism. As will be discussed more fully below, this case, unlike *Nolan*, is not close.

[10] Plaintiff's attempts to discredit the opinion of Dr. Rubenstein are entirely inadequate. Plaintiff cites deposition transcripts of Dr. Rubenstein taken in 1995 (in a case in Santa Clara County) and in 2002 and 2006 (in cases in Alaska). Plaintiff fails to establish any grounds for the admissibility of these documents.

13

Judge Goldhammer did conclude that plaintiff was disabled (within the meaning of the Social Security Act) through August, 2005, he could not have considered evidence relevant to the period at issue here: October of 2005.

Plaintiff contends that she submitted independent medical documentation of her disability, but that Bayer failed to consider this evidence. First, plaintiff claims that she was examined by her physician, Dr. Roxanne Fiscella, on January 28, 2005 but that Dr. Fiscella's report has been omitted from the administrative record. Dr. Fiscella stated in a letter dated March 15, 2005 that she was plaintiff's primary care physician and that plaintiff's two specialists (Dr. Friedberg and Dr. Mathias Masem, a hand specialist) had "taken over care" of plaintiff's condition, which Dr. Fiscella described as "partial paralysis of her right hand." BA 0395. Dr. Fiscella also stated that she last examined plaintiff on January 12, 2005. The Court concludes that documentation of plaintiff's examination in January, 2005 by a primary care physician who was not treating plaintiff's purportedly disabling condition is not relevant to a determination of whether that condition was disabling in October, 2005.

Plaintiff also claims that Bayer improperly discredited a 2004 report from Dr. Masem. Again, the court finds that this evidence is not dispositive. Plaintiff submits documents that purport to be the complete medical records of Dr. Masem. These records consist of two notes, dated July 11, 2004 and August 10, 2004. The August note records "persistent hypersensitivity" in plaintiff's right hand and "slight improvement" in her condition. Dr. Masem's notes include no conclusions about whether plaintiff's condition ever prevented her from working. Again, the Court finds that these notes have no bearing on whether plaintiff's condition was disabling in late 2005.

Plaintiff also emphasizes the e-mail exchange between Broadspire and Bayer in October, 2004 and February, 2005, in which Broadspire noted that its vocational expert had determined plaintiff was not employable in the job market and asked whether Bayer could give her a job that would accommodate her disability. Bayer responded that it required an evaluation from a physician and asked Broadspire to follow up as quickly as possible. There is no evidence that Bayer was ever provided with this additional documentation. Moreover, there is no evidence that plaintiff ever sought to return to her old job at Bayer with an accommodation such voice recognition software. Indeed, she told evaluators

that she was angry at Bayer for assigning her the job of Quality Assurance Release Document Specialist and that she did not wish to return to her former position. *See* BA 54-30; BA 54-68.

The Court's analysis would proceed differently if plaintiff had been examined in mid- or late-2005 by a medical professional who concluded that she continued to be disabled, and if plaintiff had submitted that evidence to Broadspire and Broadspire had discredited plaintiff's evidence while crediting its own experts. But that is not what happened. Plaintiff failed to comply with Broadspire's reporting requirements and did not submit her own medical evidence when given an opportunity to do so. It was therefore not an abuse of discretion for Broadspire to conclude that plaintiff was not disabled in October, 2005 and for Bayer to terminate her benefits the following month.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment and DENIES plaintiff's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: January 26, 2009

SUSAN ILLSTON
United States District Judge